**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.: 21-CR-143 (RC)** |
| **v.** | : | |
| **BENJAMIN H. TORRE,** | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Benjamin Torre to 14 days of incarceration, three years of probation, 60 hours of community service, and $500 restitution.

I.    **Introduction**

The defendant, Benjamin Torre, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1]    Although the Statement of Offense in this matter, filed on March 9, 2022, (ECF No. 32 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On March 9, 2022, Torre pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of two weeks of incarceration is appropriate in this case because Torre entered the Capitol through a broken window in the Senate Wing with a large group of rioters; entered both the Senate Spouse's Lounge and Senator Merkley's "hideaway" office; and then later exited through that same broken window, climbing over broken furniture to do so; all of which occurred after he had observed rioters break open doors, climb scaffolding, and witnessed a police line form to stop those rioters.  While inside the Capitol, Torre was captured on an open-source Livestream video describing how "wild" the events were and posed for a photograph with USCP officers who had been overrun by the rioters.  However, Torre was in about the building for about 15 minutes and has been cooperative with law enforcement.

The Court must also consider that Torre's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement officers, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the certification vote. Here, Torre's participation in a riot that actually succeeded in halting the Congressional certification combined with his behavior renders the recommended sentence "sufficient, but not greater than necessary to comply with the purposes of" the federal sentencing regime in this case. *See* 18 U.S.C. § 3553(a).

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at ¶¶ 1-7. As this Court knows, a

riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Torre's conduct and behavior on January 6.

*Benjamin Torre's Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, Benjamin Torre drove to Washington, D.C., with his parents, brother, and a friend from their homes in Georgia to attend the "Stop the Steal" rally. On January 6, he went to the rally and heard former President Trump speak. Torre heard Mr. Trump tell the crowd to march to the Capitol, so he and a friend did just that.

Torre approached the western side of the Capitol building. As he later noted in a voluntary interview with the FBI, Torre observed that things at the building were a "little heated." He observed that police had formed a line along the Capitol to stop people from climbing on the scaffolding; although Torre believed the police were doing so to prevent those people from falling and hurting themselves. Torre also told the FBI that he observed rioters break the window of a door with a cane, reach inside the broken window, and then open the door.

Shortly after 3:00 p.m., Torre was in a large mass of people outside the Capitol Building near the Senate Wing door, as depicted in the below screenshot from a video obtained pursuant to the execution of a search warrant on Torre's phone.



By the time he reached the door, the door was open and the windows on either side of it had been smashed out.  Rioters were streaming through the door and broken windows into the Capitol, as officers stood by, unable to contain the mob.[2]  Torre exploited that chaos by climbing through one of the broken windows adjacent to the Senate Wing door and entering the Capitol.  At the time, a group of Capitol Police officers were nearby, just to his left, blocking rioters from advancing toward the Senate Chamber. In the image below, Torre is in red, and an arrow points to the group of Capitol Police officers



Once inside, he pumped his fist in the air a few times; [3]

---

[2]   According to his statement to the FBI, Torre felt that the officers "helped us in Capitol," because they did not shout or try to stop them from coming inside.
[3]   No audio accompanies the surveillance footage from which these screen shots were captured.  However, at the time that Torre pumped his fist in the air, a few other rioters did so at the same time, suggesting that they did so in response to something another person said.



and immediately began using his phone to take video.



The corresponding video recovered from Torre's phone captured the crowd chanting "USA! USA!

USA!"

Torre walked towards and entered Oregon Senator Jeff Merkley's Capitol Building office,[4] room number S140, the entrance to which is visible in the upper left corner of the above photo circled in blue, and the Senate Spouse's Lounge, which is just further up the hallway.  Inside S140, Torre was captured on an open-source Livestream video, as depicted below.  Torre spent several moments walking around inside the office, which was ransacked by rioters.



Torre was not the only rioter in Senator Merkley's office.  Collectively, the rioters who invaded the office throughout the day—when it should have been a workspace for the Senator during the certification of the Electoral College vote—prompted Senator Merkley to post a video at 11:36 p.m. that night chronicling the damage to his office.  The video was rebroadcast by major news outlets.

During the video, Senator Merkley called the room his "hideaway office," and noted that it is a level below the Senate floor.  The Senator stated that he had been inside the office before going to the Senate floor that day for the Certification.  Senator Merkley also mentioned in the video that the door – which was unlocked – virtually was broken off its hinges, that items had been

---

[4]     While the office was not labeled as Senator Merkley's, it clearly was a private office, with personal mementos on the walls and typical office furniture.

torn off the walls, including a scroll made for him by a Chinese calligrapher, a laptop that had been left on the conference room table was stolen, and cigarette butts were left on a conference table. Senator Merkley further noted that the rioters "left a Trump flag here to mark their presence."  In Senator Merkley's words, one could "count this office trashed."  The government currently does not have any evidence that Torre participated in damaging property inside the Senator's office.

Torre also made his way into the Spouse's Lounge, just down the hallway from S140. There he again was captured on the same open-source Livestream video, smiling broadly, as he looked out of a window that faces an exterior plaza of the Capitol.  Visible through the window is a police line holding other rioters at bay.



As captured by the video, Torre stated, "This is fucking wild man."  Torre then moved slightly away from the window, turned to the camera, as depicted in the screen shot below, and said, "This is crazy.  I've never seen anything like this before in my life.  God dang, dude.  I've been here so many times in my life, but never like this.  Never like this."



After leaving S140 and the Spouse's Lounge, Torre had apparently seen enough and walked back towards the Senate Wing Door, stopping to take a selfie-style photo, and climbing over broken furniture on the way.



Before leaving the building, Torre stopped to speak with police officers.  According to his pre-arrest statement to the FBI, he told them, "We are here in support of you, and we back the blue." Torre then posed for a photograph with several officers, again pumping his fist in the air.



Below is one of the resulting photographs, obtained from Torre's cell phone.



A few seconds later, Torre climbed out of the same window that he had entered less than 15 minutes before.



As referenced above, on January 25, 2021, prior to his arrest, Torre spoke with the FBI at his parents' home, where he resides.  His parents were present during the interview.  Torre provided an account consistent with surveillance footage from the Capitol.  He recounted being in one room with a white couch – consistent with the Spouse's Lounge, which has a goldish colored couch – but did not mention his time inside S140.  Torre insisted during his interview that the police did not "stop, hinder, or do anything to keep people from inside the Capitol."  He also told the agents that he got caught up in the moment when he entered the Capitol, and that someday he could tell his children that he was there on January 6th.  Torre further admitted that he told people that he had been at the Capitol on January 6, but that what happened "was not what you see on the news.  TikTok makes it look really bad.  Instagram makes it look really bad."

*The Charges and Plea Agreement*

On February 2, 2021, Benjamin Torre was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2).  On February 9, 2021, he was arrested at his home in Georgia. On February 22, 2021, Torre was charged by four-count Information with violating 18

U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(C), (D) and (G).  On March 9, 2022, he pleaded guilty to Count Five of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building.  By plea agreement, Torre agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Torre now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Torre faces up to six months of imprisonment and a fine of up to $5,000.[5]   Torre must also pay restitution under the terms of his or her plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of home detention.

---

[5]    Because Torre has pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and  smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Torre's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are

not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Torre personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Torre's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants.

Here, although Torre was only in the building for about 15 minutes, his entry was not uneventful.  After observing multiple people climb on scaffolding and witnessing a police line forming in response, and after watching someone break open a door with a cane, Torre nevertheless entered the building.  He climbed through a window that had been smashed open and climbed over furniture that had been broken and turned over.  Once he entered the building, Torre was standing amidst a large crowd, many of whom had flags and were shouting and singing.  A line of Capitol Police officers was standing in the area, and alarms were blaring.  Any reasonable person at this point should have known that the situation in the Capitol was volatile, yet Torre chose to remain part of the crowd.  Indeed, Torre stopped for a moment to hold up his phone and film the scene.

Moreover, Torre did not hesitate before walking further into the building and entering two separate rooms – including a Senator's office – inside the Capitol, even though, as he later admitted, the scene had become "heated."  His decision to do so is one of the principal aggravating factors in his case.  As members of Congress and their staff hid nearby, Torre entered a private office that had been, as the Senator stated, "trashed," and smiled broadly in the Livestream video that captured him inside the Spouse's Lounge.  This, together with his glib comments inside the Spouse's Lounge that the events were "wild," and that he had never been in the Capitol "like this,"

underscores his callousness towards the riot and his lack of respect for the seat of our government, the rule of law, and the peaceful transfer of power.

To be sure, this was not just some boyish prank.  Torre was angry about the election and his entry into both private rooms was an act of arrogance, a show of power and control.  It showed that, in that moment, Torre viewed the private rooms of members of Congress as the dominion of himself and all the other members of the mob.  To commemorate this control, Torre posed for a selfie-style photograph, with the rioters and damaged property outside the Senate Wing door as a backdrop.  While members of Congress and staffers hid in a bunker or barricaded themselves in other officers, Torre posed, smiling broadly and with his fist raised in triumph, for a photograph with USCP officers who had been overrun by the mob.  As Torre told the FBI agents later, someday he would be able to tell his children that he was there, and he made sure to have the photographs to prove it.

Finally, it is worth noting that Torre traveled to Washington D.C. with his parents, both of whom attended the Stop the Steal rally with President Trump; but neither of whom made the monumentally poor decision to join a riotous mob attempting to prevent the peaceful transfer of power.

Although Torre's conduct on January 6 was troubling, he participated in the riot to a lesser degree than many defendants and was in the building for a short – but eventful – period.  Thus, the nature and circumstances of the offense, specifically the aggravating factors described above, suggest that a purely probationary sentence is inappropriate in this case and support a sentence of two weeks incarceration and a probationary term of three years.

### B.  Torre's History and Characteristics

As set forth in the PSR, Torre has no criminal history.  He is a young man who, on January 6, lived with his parents and worked at the Gap.  At the time of PSR interview, he still lives with his parents and maintains employment.  Torre has been substantially compliant with his conditions of pre-trial release, although he failed to report on three occasions.  ECF No. 30.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH) Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[6]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *United States v. Matthew Mazzocco*, 21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM) Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

<em>Specific Deterrence</em>

Benjamin Torre climbed through a broken window to enter the Capitol.  He knew what he was doing was wrong at the time it was happening, yet he did it anyway.  Indeed, he was accompanied to the earlier rally by his two parents, neither of whom joined in the riotous mob breaking into the Capitol.  Yet rather than follow the example of his parents, he ignored the obvious mayhem swirling around him, and entered the Capitol.  He claims that he got caught up in the moment.  A short sentence of incarceration, as opposed to probation, would further convey to Torre that his conduct on January 6 had grave consequences and ensure that he does not get caught up in an insurrectionist mob again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[7] *United States v. Anna Morgan-Lloyd*, 21-

---

[7]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 21-cr-00097(PFF);

cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Torre has pleaded guilty to Count Five of the Superseding Information, charging him with Parading, Demonstrating or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar

---

*United States v. Donna Sue Bissey*, 21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 21-cr-00365(DLF). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.   *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

In cases involving entry into sensitive spaces, the government has recommended, and courts have often imposed jail time. To that end, while no previously sentenced case contains the same balance of aggravating and mitigating factors present here, *United States v. Oliver Sarko*, 21-cr-00591 (CKK) shares several similarities with this case. Like Torre, Sarko pleaded guilty to a single count of violating 40 U.S.C. § 5104(e)(2)(G). Like Torre, Sarko observed other rioters make a violent entry into the U.S. Capitol. Like Torre, Sarko took videos inside and outside the Capitol during the riot. Like Torre, Sarko chanted and cheered during the riot. And most significantly, like Torre, Sarko entered the office of Senator Merkley while other rioters were inside, but apparently did not participate in the trashing of that office and further entered a room used by visiting spouses of United States Senators and members of the House of Representatives. Unlike Torre, Sarko posted a video of himself during the riot on social media, and made some inflammatory statements captured on video ("We are storming the Capitol out here"; "Where are the traitors"; "Bring out Pelosi!"; "We won't let you steal this country"). The government recommended a "split sentence" of 30 days' incarceration and 36 months of probation, which is what Judge Kollar-Kotelly imposed, after finding that she had authority to impose such a sentence.

Another relevant case is *United States v. Brian Stenz*, 21-cr-00456 (BAH). Like Torre, Stenz pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). Like Torre, Stenz entered the Capitol Building through the Senate Wing door, where he observed broken glass from two windows strewn across the floor and a broken and overturned wooden cabinet. Like Torre, Stenz took photographs while inside the building. Like Torre, Stenz entered Senator Merkley's office and took photographs there. Unlike Todisco, Stenz initially denied he went inside that office, and has a significant criminal history. The government requested a split sentence of 14 days'

incarceration and 36 months of probation. Pursuant to 18 U.S.C. § 3653(b)(10), Chief Judge Howell imposed a sentence of 14 days of custody as a condition of 36 months of probation.

Finally, in *United States v. Nathan Entrekin*, 21-cr-00686 (FYP), the defendant also pleaded guilty to a single count of violating 40 U.S.C. § 5104(e)(2)(G). He entered the Capitol building on two separate occasions and entered both Senator Merkley's Office and the Senate Parliamentarian's Office. Unlike Torre, Entrekin had a minor criminal history, and shouted during the riot that Members of Congress "take our money and use it for nefarious purposes," and that "we can't let Biden be our President." Judge Pan sentenced Entrekin to 45 days' incarceration and 36 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.

This Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," i.e., a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has

been convicted of a "petty offense." *See United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21-cr-591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21-cr-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence). But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *See United States v. Mize*,

No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF 43 (D.D.C. Apr. 29, 2022) (same); *United States v. Heinl*, 21-cr-370 (EGS) ECF 43 (D.D.C. June 2, 2022) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks, but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent"

confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Benjamin Torre to 14 days of incarceration, three years of probation, 60 hours of community service,  and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Kimberley C. Nielsen*
Assistant United States Attorney
N.Y. Bar No. 4034138